IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

EASTERN DIVISION

| | | |
|---|---|---|
| INTERCEPT CORPORATION, | : | |
| | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | No._____ |
| | : | |
| CONSUMER FINANCIAL PROTECTION BUREAU, | : | |
| | : | |
| | : | |
| Defendant. | : | |

## Complaint

Plaintiff Intercept Corporation ("Intercept"), by and through its undersigned attorneys, for its Complaint against Defendant Consumer Financial Protection Bureau (the "CFPB" or "Bureau") alleges as follows:

### Preliminary Statement

1. This is an action challenging the structure and operation of the CFPB, an entity recently created through the Dodd-Frank Act, Title X, 12 U.S.C. §§ 5481 *et seq.* ("Dodd-Frank Act").

2. Intercept brings this action seeking injunctive and declaratory relief to prevent the CFPB from continuing to exercise oversight over the company's payment processing activities, and to prevent the CFPB from bringing a proposed administrative enforcement action against Intercept.

3. In violation of the Constitution's separation of powers, the Dodd-Frank Act grants sweeping power to one individual—CFPB Director Richard Cordray (the "Director")—yet fails to impose any meaningful safeguards on that power.

4. Illustrating—and compounding—these constitutional infirmities, the Director has taken a lead role in a Bureau inquiry into whether Intercept complied with the Consumer Financial Protection Act ("CFPA"), in disregard of his ultimate obligation to serve as a neutral arbiter of Intercept's conduct should the Bureau bring an administrative enforcement action against the company. *See infra* ¶¶ 61–64 (describing the Director's conclusion that he has *de novo* review of facts and law in such proceedings).

5. That is, notwithstanding his duty to remain free from bias and to withhold judgment until all sides can be heard, CFPB Enforcement Attorneys ("Enforcement Staff") have informed Intercept that the Director has conferred on an *ex parte* basis with Enforcement Staff regarding the merits of Intercept's proposed case; has concluded in advance of an administrative proceeding that the company violated the CFPA; and has personally dictated the injunctive and monetary relief to be extracted from Intercept in exchange for a settlement of the Bureau's inquiry.

6. Enforcement Staff also communicated the Bureau's unprecedented view that the CFPA's three-year statute of limitations, *see* 12 U.S.C. § 5564(g) (providing that "no action may be brought under this title more than 3 years after the date of discovery of the violation to which an action relates") does not begin to run until the Director determines that a regulated entity has violated the statute—that is, no violation is "discovered" until the Director *personally* makes a conclusive finding of liability—indicating not only that the Director's *ex parte* and premature determination of liability is a settled practice within the Bureau, but also

that the Director purports to have the ability to indefinitely toll the protections of the CFPA's statute of limitations by delaying his formal determination.

7. Enforcement Staff's frank statements regarding the Director's predetermination of Intercept's liability were delivered as part of a presentation urging the company to agree to a consent order, in an apparent effort to convince Intercept that it would not receive a fair hearing before the Bureau in the administrative proceeding that would ensue should Intercept refuse to settle.

8. In sum, the CFPB's structure permits the Director to wield unconstitutionally outsized authority at every stage of the investigative and adjudicative process without sufficient accountability.

9. The Director, unsurprisingly, has made full use of his autonomy by: (i) establishing a practice of determining a regulated entity's liability before the CFPB commences an administrative proceeding and before the regulated entity is afforded an opportunity to present its defense; (ii) directing Enforcement Staff to convey his judgment to the regulated entity in an effort to force the entity to settle with the CFPB; and (iii) promulgating rules that restrict a respondent's basic procedural protections in the administrative proceeding that would commence should the regulated entity seek to challenge the Director's conclusions. All of these abuses operate to coerce settlements from regulated entities by threatening to deprive them of their right to a fair hearing before an impartial adjudicator.

10. Because of the foregoing, the actions that the CFPB has taken, and proposes to take, against Intercept are unconstitutional and void.

11. Accordingly, Intercept seeks a declaration that the Dodd-Frank Act vests undue power in the Director of the CFPB, without sufficient oversight by the Executive branch,

in violation of the separation of powers mandate of the Constitution, as well as injunctive relief barring the CFPB from taking further action against Intercept in light of the unconstitutionality of the Bureau. Failing that relief, Intercept seeks a declaration that an administrative proceeding would afford the company insufficient procedural protections given that the Director has refused to act as a neutral and detached arbitrator and instead has directed the Bureau's inquiry and predetermined Intercept's liability, as well as corresponding injunctive relief prohibiting the Bureau from filing an enforcement action in such a forum.

## The Parties

12. Intercept is a North Dakota corporation with a principal place of business at 1700 42nd Street South, Suite 2000, Fargo, ND 58103.

13. The company was founded in 1993 and currently employs 26 individuals in the Fargo region.

14. Intercept processes payments principally for payroll processors, but also for churches, utilities, daycare centers, various professionals (including accountants and tax preparers), and other businesses.

15. Payroll processors represent over 95% of Intercept's customer base, and the vast bulk of its transaction volume.

16. Until approximately three years ago, the company also processed payments for select online short-term consumer lenders; in the middle of 2013, however, the company made a business decision to cease processing for these lenders and by the fall of 2013 wound down its processing activities with these lenders entirely.

17. The CFPB is an agency of the United States, with a business address of 1700 G Street NW, Washington, D.C. 20552.

18. The Bureau was established pursuant to the Dodd-Frank Act "to regulate the offering and provision of consumer financial products or services under the Federal consumer financial laws." 12 U.S.C. § 5491(a).

### Jurisdiction and Venue

19. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 2201 and 5 U.S.C. § 702.

20. Venue in this district is proper pursuant to 28 U.S.C. § 1391(e).

### Factual Allegations

### The CFPB's Exercise of Oversight over Intercept's Historical Processing Activities

21. On January 20, 2015, the CFPB issued to Intercept a civil investigative demand ("CID") initiating an inquiry into Intercept's former processing on behalf of online short-term consumer lenders, approximately 16 months after Intercept voluntarily ceased processing for these customers.

22. According to the CID, the purpose of the inquiry was:

> [T]o determine whether payment processors or other unnamed persons have engaged, or are engaging in, unlawful acts and practices in connection with the processing of payments and the initiation of electronic debits for payday loans or other consumer financial products or services, in violation of section 1031 and 1036 of the Consumer Financial Protection Act of 2010, . . . the Electronic Funds Transfer Act, . . . or other Federal consumer financial law. The purpose of this investigation is also to determine whether Bureau action to obtain legal or equitable relief would be in the public interest.

23. Intercept spent significant resources (including fees for outside counsel) on producing documents responsive to the CID on a timely basis.

24. Over the next several months, the CFPB issued additional CIDs for the production of documents and the testimony of Intercept's corporate designee.

25. In response to these CIDs, Intercept again devoted substantial resources to identifying responsive materials among the millions of documents in its possession, and in preparing for an investigational hearing of its corporate designee, which took place in Fargo.

26. On information and belief, the CFPB also has issued CIDs to Intercept's banks, which has interfered with Intercept's business relationships with current customers and threatened the viability of its business.

27. On November 30, 2015, the CFPB notified Intercept that Enforcement Staff "is considering taking legal action" against Intercept for the violation of "the prohibition of unfair acts and practices under the [CFPA]" and expressing its intention to seek "court-ordered injunctive relief . . . as well as damages and civil monetary penalties."

28. On December 14, 2015, Intercept responded by highlighting several flaws in the CFPB's proposed case but noted that Intercept's ability to respond more fully was impeded by the CFPB's unwillingness to "share … many of the critical elements of the proposed lawsuit; namely, the particular entities or individuals you intend to sue, the losses you believe were caused by the alleged violations, and the precise cause of action under which you intend to proceed."

**The Director's Personal Involvement in the Intercept Matter**

29. On April 15, 2016, counsel for Intercept met in Washington, D.C. with CFPB Enforcement Staff.

30. Nothing in the CFPA or in the Bureau's internal rules requires or authorizes the Director to make a finding of liability with respect to a regulated entity before the Bureau commences an enforcement proceeding, nor does the statute or the Bureau's rules require or authorize the Director to lead the Bureau's efforts to settle inquiries. 12 U.S.C. § 5564; 12 C.F.R. § 1081.200.

31.     In fact, the Director has an obligation to remain impartial because he would ultimately be called upon to serve as a neutral arbiter of Intercept's conduct in an administrative proceeding should one arise. *See* 12 C.F.R. § 1081.405(a); *infra* ¶¶ 61–64 (describing the Director's appellate authority in such proceedings)

32.     Nevertheless, during the April 15 meeting, Enforcement Staff reported that the Director:

      a.     Had met with Enforcement Staff to discuss the basis for bringing a case against Intercept;

      b.     Concluded on March 29, 2016 that Intercept violated the CFPA—not by engaging in any deceptive or fraudulent conduct, but rather by engaging in the "unfair act or practice" of failing to monitor sufficiently its former online short-term consumer lender customers;

      c.     Approved a complaint to be filed against Intercept; and

      d.     Personally crafted the injunctive relief to be imposed on Intercept's ongoing operations, and quantified the civil monetary penalties to be paid by Intercept, should the company instead agree to settle the Bureau's inquiry.

33.     The Director took the foregoing unconstitutional actions knowing that he alone would serve as the final adjudicator of an administrative proceeding against Intercept. *See Christiansen v. W. Branch Cmty. Sch. Dist.*, 674 F.3d 927, 937 (8th Cir. 2012) ("An impartial adjudicator is a basic requirement of due process.").

34.     Indeed, the purpose of highlighting the Director's unusual involvement in the Intercept inquiry, and his prejudgment of Intercept's liability under the CFPA, was to compel

the company into settling the Bureau's inquiry by clearly communicating to Intercept that the company would not receive a fair hearing in an administrative proceeding.

35. The Director's actions also had the effect of eliminating Intercept's ability to avoid a prolonged and costly inquiry by convincing Enforcement Staff that Intercept's conduct was compliant with the CFPA.

36. Also during the April 15 meeting, in another seeming attempt to compel settlement, Enforcement Staff stated that notwithstanding its failure to establish that Intercept engaged in knowing misconduct, the Bureau was empowered to seek "billions" of dollars in civil monetary penalties from the company.

37. The CFPB also asserted, in subsequent correspondence, that the proposed injunctive relief sought by the Bureau would apply prospectively and to the entirety of Intercept's customer base, despite the fact that: (i) the CFPB's inquiry, findings and conclusions had focused exclusively on Intercept's short-term consumer lending clients, none of which were current customers; and (ii) the Bureau, accordingly, had made no findings or conclusions relating to Intercept's current customers to support injunctive relief directed at their activities.

38. During the April 15 meeting, the CFPB also took the shocking position that notwithstanding the three-year statute of limitations period imposed on the CFPB by Congress in the CFPA, *see* 12 U.S.C. § 5564(g), the Bureau had the power to indefinitely delay the running of the limitations period until the Director *personally* concluded that there had been a violation of the statute. Applying that logic, the Bureau concluded that the relevant statute of limitations period for Intercept began running not when the Bureau could reasonably have discovered a violation by the company (*i.e.*, 2013 at the latest) but rather on March 29, 2016, *the date that the Director concluded that Intercept violated the CFPA. See supra* ¶ 32(b).

39. Again, the purpose of this statement was to communicate to Intercept that the Director had already determined Intercept's liability and that the company would have no resort to fundamental statutory protections should it refuse to settle.

40. Following the April 15th in-person meeting, on April 18, 2016, the CFPB formally issued a written settlement demand to Intercept in the form of a consent order that contained the case caption "ADMINISTRATIVE PROCEEDING File No. 2016-CFPB-[Docket#]." (emphasis and highlighting in original).

41. The consent order sought $12 million in civil monetary penalties (notwithstanding the Bureau's position, articulated during the April 15, 2016 meeting, that it could seek billions of dollars in penalties). The order also contained the onerous injunctive relief proposed by the Director and communicated to Intercept's counsel during the April 15, 2016 meeting.

42. On May 9, 2016, during a telephone call, Enforcement Staff reported to counsel for Intercept that the Director:

    a. Remained intensely interested in the matter; and

    b. Directed the CFPB not to make any further attempts to settle the inquiry until the company met a minimum threshold for civil monetary penalties that the Director had calculated but refused to disclose.

43. In response, on May 19, 2016, Intercept sent the CFPB a letter expressing its concerns about the Director's involvement in the inquiry. (*See* May 19, 2016 Letter from Intercept to CFPB Enforcement Staff, a true and correct copy of which is attached as Exhibit A.)

**The Structure of the CFPB Violates the Separation of Powers**

44. The structure of the CFPB facilitates the misconduct described above.

45. Unlike countless federal agencies, the powers of the CFPB are vested in a single individual: the Bureau Director. 12 U.S.C. § 5491(b).

46. And unlike other federal agencies, the Director has determined that the statute of limitations applying to the principal statute that he administers does not run until *he personally* finds a violation of the statute, a position unsupported by the law, but which CFPB Enforcement Staff wield as a means of compelling regulated entities into accepting the Bureau's consent orders.

47. The Director's powers are not limited to those set forth in the CFPA; rather, he has the authority to enforce no fewer than eighteen federal statutes. 12 U.S.C. § 5481(12), (14).

48. As head of the Bureau, he is also empowered to issue regulations, including those governing the procedures for administrative proceedings.

49. The Director's powers are not checked by the President of the United States or Congress; nor are they diffused through a multi-member commission.

50. The Director is not answerable to the President because the Director is removable only in limited circumstances. 12 U.S.C. § 5491(c) (providing the President may remove the Director only "for cause"—*i.e.*, "inefficiency, neglect of duty, or malfeasance in office"); *see Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 484 (2010) ("The President cannot 'take Care that the Laws be faithfully executed' if he cannot oversee the faithfulness of the officers who execute them." (quoting U.S. Const. art. II, § 1, cl. 1)); *Myers v. United States*, 272 U.S. 52, 134 (1926) ("[T]he President "must have the power to remove [executive officers] without delay.").

51.     Moreover, the Director serves a five-year term irrespective of any change in the Executive administration. Indeed, as the CFPB recently conceded during oral arguments before the United States Circuit Court for the District of Columbia, the Director can "serve out his or her term regardless of what the next President wants in terms of . . . consumer financial protection," unless terminated for cause. Transcript of Oral Argument at 17, PHH Corp. v. CFPB, No. 15-1177 (D.C. Cir. Apr. 12, 2016) (Kavanaugh, J).

52.     Nor is the Director answerable to Congress, as the Director has the power to unilaterally fund the CFPB by requisitioning up to 12% of the Federal Reserve's operating expenses—$631.7 million for the fiscal year 2016 and $646.2 for the fiscal year 2017. 12 U.S.C. § 5497(a)(1); Consumer Financial Protection Bureau, *The CFPB Strategic Plan, Budget, and Performance Plan and Report* 9 (Feb. 2016), *available at* http://files.consumerfinance.gov/f/201602_cfpb_report_strategic-plan-budget-and-performance-plan_FY2016.pdf.

53.     Congress has no authority to review the Director's budget demand. 12 U.S.C. § 5497(a)(2)(c).

54.     The Director thus functionally possesses Congress's constitutionally-granted power of the purse. *See Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 427–28 (1990) (noting that this power has the "fundamental and comprehensive purpose" of "assur[ing] that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents").

55.     Nor is the Director's power diffused through a multi-member commission, which would impose a moderating influence. As Judge Kavanaugh of the United States Circuit

Court for the District of Columbia recently observed during oral argument in a case challenging the constitutionality of the CFPB's structure: "it's very dangerous in our system to put such huge power in a single person." Transcript of Oral Argument at 17, PHH Corp. v. CFPB, No. 15-1177 (D.C. Cir. Apr. 12, 2016) (Kavanaugh, J) (also noting that the multi-member commission structure ensures an agency will be "non-partisan or bipartisan," a feature which "you can't have . . . with a single person").

56.     This coalescence of unchecked power in a single person violates the constitutionally-mandated separation of powers.

### CFPB Enforcement Actions

57.     Further illustrating these structural infirmities, the CFPB—through the Director—has promulgated rules governing administrative proceedings that deny respondents basic procedural protections.

58.     The CFPB may bring an enforcement action under the CFPA through an in-house administrative proceeding or in federal district court. 12 U.S.C. §§ 5563(a), 5564(f). The Bureau and federal district court can award identical remedies, including injunctive relief and civil monetary penalties. 12 U.S.C. § 5565(a).

59.     When the CFPB proceeds in federal court, the Seventh Amendment and Federal Rules of Civil Procedure and Evidence apply. A defendant in federal court is thus entitled to a jury trial (in most cases), to take discovery as it would in any civil matter, and to bring counterclaims against the CFPB.

60.     By contrast, the CFPB has promulgated rules that have sharply curtailed the rights of respondents in administrative proceedings. Bureau of Consumer Protection Rules of Practice for Adjudication Proceedings, 77 Fed. Reg. 39058 (June 29, 2012).

61. Upon the filing of charges in an administrative proceeding, the matter is assigned to an administrative law judge ("ALJ"), who is required to issue a "recommended decision" no later than 300 days after the proceeding was initiated. 12 C.F.R. §§ 1081.105, 1081.400.

62. The Director alone hears any appeal of an ALJ-recommended decision. 12 C.F.R. § 1081.405(a).

63. In considering an appeal, "the Director will consider such parts of the record as are cited or as may be necessary to resolve the issues presented and, in addition, will, to the extent necessary or desirable, exercise all powers which he or she could have exercised if he or she had made the recommended decision." *Id.*

64. The Director has construed this internal regulation to mean that his "review as to both facts and law is *de novo*." PHH Corp., No. 2014-CFPB-0002, Decision of the Director at 9 (June 4, 2015).

65. In contrast to a defendant in federal court, a respondent in a CFPB administrative proceeding:

   a. Has no right to a jury trial, as a matter is first heard by an ALJ with subsequent appeals before the Director and a Circuit Court of Appeal;

   b. Cannot take "traditional forms of pre-trial discovery, such as interrogatories and discovery depositions." Bureau of Consumer Protection Rules of Practice for Adjudication Proceedings, 77 Fed. Reg. 39058, 39059 (June 29, 2012);

   c. Must conduct what little discovery that is permitted on an expedited basis, as an ALJ *must* issue a recommended decision within 300 days of charges being filed against the respondent. 12 C.F.R. § 1081.400; and

      d.  Has no mechanism for raising counterclaims against the CFPB.

  66.  Moreover, the CFPB has taken the position that it lacks the authority to address constitutional claims that are dispositive of a matter, *see* Westgate Resorts, Ltd., No. 2015-MISC-0001, Director's Decision and Order on Petition to Modify or Set Aside Civil Investigative Demand at 2 (Mar. 11, 2016) (holding that a petitioner's "constitutional challenge is not properly raised in an administrative proceeding . . . because 'government agencies may not entertain a constitutional challenge to authorizing statutes.'" (*quoting United Space All., LLC v. Solis*, 824 F. Supp. 2d 68, 97 n.10 (D.D.C. 2011))), meaning that a respondent challenging the CFPB or its proceeding as unconstitutional has no immediate recourse should the Bureau file its action administratively and, because the Bureau has restricted the taking of discovery, no ability to develop a factual record establishing a constitutional violation for review by the Circuit Court.

  67.  The CFPB says it modeled its rules of practice for administrative proceedings after the rules governing SEC administrative proceedings. *See, e.g.*, Bureau of Consumer Protection Rules of Practice for Adjudication Proceedings, 77 Fed. Reg. 39058, 39059 (June 29, 2012) ("The Bureau has adopted the SEC's affirmative disclosure approach to fact discovery in administrative adjudications."). As described above, however, there are critical differences in the structure of the CFPB and in how it exercises its power that prevent a party from receiving a fair hearing before the Bureau.

  68.  The Dodd-Frank Act permitted the SEC, like the CFPB, to bring enforcement actions administratively or in federal district court and to seek identical penalties in each forum. *See* H.R. Rep. No. 111-687, at 78 (2010) (explaining that "the SEC's authority in administrative penalty proceedings [is] coextensive with its authority to seek penalties in Federal court.").

69. The denial of basic procedural protections to respondents in administrative proceedings is not academic. Indeed, the results in the SEC context have been telling: over the last five years, the agency has prevailed in 90% of cases brought before administrative law judges, but only in 69% of cases before federal district court judges. Jean Eaglesham, *SEC Wins with In-House Judges*, WALL ST. J., May 6, 2015.

70. In sum, the CFPB's structure has allowed the Director to wield and arrogate for himself unrestrained authority at every stage of the Bureau's investigative and adjudicative process.

71. The Director has made full use of his autonomy by: (i) establishing a practice of determining a regulated entity's liability before the CFPB commences an administrative proceeding and before the regulated entity is afforded an opportunity to present its defense; (ii) directing Enforcement Staff to convey his judgment to the regulated entity in an effort to force the entity to settle with the CFPB; and (iii) promulgating rules that restrict a respondent's basic procedural protections in the administrative proceeding that would commence should the regulated entity seek to challenge the Director's conclusions. All of these abuses operate to coerce settlements from regulated entities by threatening to deprive them of their right to a fair hearing before an impartial adjudicator.

## Claims for Relief

### Count One
### Application for Injunctive Relief

72. Intercept incorporates the allegations set forth above as if fully set forth herein.

73. Without an injunction barring the Bureau from taking any further action against Intercept, the company will suffer irreparable harm because the CFPB's ongoing exercise

of oversight over Intercept's operations, the costs attendant to that oversight, and the CFPB's interference with the company's banking and other business relationships with new and existing customers threaten the viability of the company. Intercept has no remedies at law to compensate this harm—which far outweighs any harm to the CFPB—because various sovereign immunity doctrines constrain its right to collect money damages from the CFPB. The requested injunction will serve the public interest by ensuring that administrative agencies operate constitutionally. Finally, the Bureau's inability to maintain its inquiry will not harm the public because the conduct at the center of the Bureau's inquiry ended nearly three years ago, long before the CFPB issued its first CID.

74. In the alternative, Intercept seeks an injunction prohibiting the Bureau from commencing an administrative enforcement proceeding in light of the Director's wrongful refusal to act as a neutral and detached arbitrator in Intercept's case and the insufficient procedural protections available in that forum. Proceeding in such an unfair and unconstitutional forum lacking all the protections described *supra* in ¶¶ 57–71 in itself represents irreparable harm. Moreover, the company would incur significant costs in defending itself and would sustain unquantifiable and irrevocable harm to its reputation in the eyes of its new and existing customers. For the reasons stated *supra* in ¶ 73, this harm is not compensable by money damages and far outweighs any harm the CFPB would suffer. And similarly, issuance of the injunction would serve the public's interest in ensuring administrative agencies act constitutionally and would in no way harm the public because Intercept voluntarily ended nearly three years ago the conduct at the center of the Bureau's inquiry.

## Count Two
## Declaratory Judgment

75. Intercept incorporates the allegations set forth above as if fully set forth herein.

76. Intercept respectfully requests a judgment under 28 U.S.C. § 2201 that the CFPB's structure violates the separation of powers or, in the alternative, that an administrative proceeding would afford the company insufficient procedural protections given that the Director has refused to act as a neutral and detached arbitrator and instead has directed the Bureau's inquiry and predetermined Intercept's liability.

## Prayer for Relief

WHEREFORE, Intercept prays for an order and judgment:

a. Enjoining the CFPB from any further inquiry or oversight into Intercept's processing activities and from filing against Intercept an enforcement action under the CFPA or any of the enumerated consumer laws in any forum;

b. Declaring that the CFPB's structure violates the separation of powers;

c. In the alternative to (a) and (b), enjoining the CFPB from filing against Intercept an enforcement action in an administrative proceeding, and declaring such a proceeding unconstitutional;

d. Awarding Intercept its reasonable costs, including attorneys' fees, incurred in bringing this action; and

e. Granting any other relief the Court deems just and proper.

Dated: May 19, 2016										Respectfully submitted,

/s/ *Michael T. Andrews*
Michael T. Andrews (N.D. Bar No. 05516)
David J. Hauff (N.D. Bar No. 04145)
ANDERSON, BOTTRELL, SANDEN & THOMPSON
4132 30th Avenue South, Suite 100
Fargo, ND 58104
Tel: (701) 235-3300
Fax: (701) 237-3154
Email: mandrews@andersonbottrell.com
dhauff@andersonbottrell.com

and

Richard J. Zack, *Pending Pro Hac Vice Admission*
Jay A. Dubow, *Pending Pro Hac Vice Admission*
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
Tel: (215) 981-4000
Fax: (215) 981-4750
Email: zackj@pepperlaw.com
dubowj@pepperlaw.com

*Attorneys for Plaintiff Intercept Corporation*